**ALEXANDER, Collector of Internal Revenue, v. CARTER OIL CO.**

No. 480.

Circuit Court of Appeals, Tenth Circuit.

Nov. 18, 1931.

Charles T. Hendler, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (Roy St. Lewis, U. S. Atty., of Oklahoma City, Okl., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for appellant.

L. G. Owen, of Tulsa, Okl. (Jas. A. Veasey, Roy F. Ford, and S. J. Montgomery, all of Tulsa, Okl., on the brief), for appellee.

Before PHILLIPS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

McDERMOTT, Circuit Judge.

The collector appeals from a judgment rendered against him for $16,149.52, in an action to recover taxes paid under section 500 of the Revenue Act of 1918 (40 Stat. 1101), for the transportation of oil by pipe line. The case was tried without a jury, and the trial court made special findings of fact. Many of the facts were agreed upon, but the

parties reserved the right to offer any competent and material evidence at the trial which did not conflict with their agreed statement. We are advised that oral evidence was offered and received at the trial, and it is apparent that some of the trial court's findings were predicated upon evidence other than the facts stipulated. Such oral evidence is not in the record; in fact, the record contains no bill of exceptions.

■ The scope of our review of actions at law tried without a jury is fixed by title 28 USC § 875 (28 USCA § 875), which provides that in such cases "the rulings of the court in the progress of the trial of the cause, if excepted to at the time, and duly presented by a bill of exceptions, may be reviewed upon a writ of error or upon appeal; and when the finding is special the review may extend to the determination of the sufficiency of the facts found to support the judgment."

There being no bill of exceptions in this case, obviously there are no rulings of the court in the progress of the trial which are open to review. The sufficiency of the evidence to support the special findings cannot be reviewed for this reason, and for the additional reasons that the evidence is not before us, and that no error is assigned on that account. Our review is limited, therefore, to the sufficiency of the facts stipulated and found, to support the judgment. White v. United States (C. C. A. 10) 48 F.(2d) 178.

The facts so disclosed are: The appellee is engaged solely in the production and sale of oil; it is not engaged in the business of refining or transportation. In 1919 it owned producing leases in the Healdton field. The pipe line facilities were inadequate to carry the production from the field, and it was necessary for the appellee to construct storage tanks to conserve the oil it was producing, and at times to hold it until prices were better. It was not practicable to erect such storage tanks on the producing leases, because that would have made it impossible to drill out the leases; even if it had been possible to have constructed the tanks on the producing leases, it would have been unwise on account of the fire hazard attaching when stored oil is close to drilling wells. So the appellee acquired title to certain land which was four miles from the closest, and twelve miles from the farthest, producing well, and constructed thereon a battery of storage tanks of 37,500 and 55,000 barrels capacity. Oil was run from the flow or settling tanks at the wells to these storage tanks through 2, 3, and 4 inch pipes. The appellee never

used these tanks or pipes for carrying or storing any oil except its own. The appellee made no charge to itself for this movement from the wells to the storage. When the oil was moved out of the storage, the appellee paid both the flat-rate gathering charge and the trunk-line charge to the pipe line carrier, and the tax imposed by section 500 was paid. This method of storage was the common practice of other producers, and was a necessary adjunct to the production of oil. The storage tanks were not located at or near an oil refinery, nor at or near any center of consumption. The movement of the oil from the wells to the storage did not lessen the cost of appellee for transportation of its oil to market; this for the reason that the "gathering charge" of pipe line carriers is fixed by their posted tariffs at a flat rate. That is, it cost the appellee just as much to transport its oil from these storage tanks to market as it would have to transport it from the wells to market; and the government receives the same amount in taxes in either case. The agreed statement recites that the function of the tanks and lines thereto was to enable appellee to store all or a part of its production in the vicinity of its producing leases. It is a fair deduction from the record that these tanks were located as close to the wells as was practicable. It is the tax on this "transportation" from the wells to the storage that this lawsuit is about.

■ The principal contention of the government is that a tax is laid upon all transportation of oil by pipe line, and that the statute does not exempt those who transport their own oil without charge. This contention is sound. Section 500 (e) of the Revenue Act of 1918 (40 Stat. 1057, 1102) lays a tax of "8 per centum of the amount paid for the transportation on or after such date of oil by pipe line." Section 501 (c) exempts any carrier, other than a pipe line, which is principally engaged in transportation of its own goods, from any tax on the transportation of its own goods. Section 501 (d), immediately following, provides that: "The tax imposed by subdivision (e) of section 500 shall apply to all transportation of oil by pipe line," and provides a method for ascertaining a fair basis for the tax when an owner transports his own oil through his own line. These two subsections manifest an unmistakable intent on the part of Congress to differentiate between carriers of oil and carriers of other commodities. Any question as to the intent of Congress has been set at rest by Motter v. Derby Oil Co. (C. C. A. 8) 16 F.

(2d) 717, certiorari denied 273 U. S. 762, 47 S. Ct. 477, 71 L. Ed. 879, and Dixie Oil Co. v. United States (C. C. A. 5) 24 F.(2d) 804.

But, as we see it, this does not reach the question in this case. The question is, Is the movement from the wells to the storage a "transportation of oil by pipe line?" It seems to us to be quite obvious that all movement of oil through pipes cannot fairly be called a "transportation" of oil, as such word is used in the oil business, as well as in common parlance. When oil is pumped from the sand to the top of the well, it is moved through a line of pipe that is spoken of as "casing." But no one would speak of this movement as the "transportation of oil." From the mouth of the well it goes to flow or settling tanks. It goes through pipe, but this movement cannot fairly be called a "transportation of oil." Counsel for the government very frankly state that the government does not consider such movement as transportation, and makes no attempt to tax it.

■ There are four phases of the oil business: Production of crude oil; transportation; refining; and marketing of the refined product. Congress has singled out the phase of "transportation" for taxation. Is the movement from the wells to storage tanks a part of production, or is it a part of transportation? It is possible for oil to go directly from the mouth of the well to the refinery; if so, transportation begins at the mouth of the well. Or, it may go to flow or settling tanks, and from thence to market. If so, transportation begins when it leaves the flow or settling tanks. More often it must go to storage tanks where it is held until it can be gauged and until pipe line facilities to the refinery are available, or until the market suits the producer. It is quite true that generally such storage tanks are small and on the lease, in which case we understand counsel to concede that the movement into storage is not and should not be taxed. Does it make a difference if the storage tanks are large or are not on the lease? These are circumstances to consider in determining whether the storage is, in good faith, a part of production, or whether it is an incident to transportation. If the appellee had constructed these large tanks a hundred miles from the leases, or near a refinery, clearly the movement to the tanks would be a part of transportation to market. The question is primarily one of fact. Oil moves through pipes in the process of its production, a movement that is conceded not to be a taxable "transportation." Was the move-

ment in this case really and in good faith a part of the business of production, or was it a part of the "transportation" contemplated by Congress? The appellee's tanks were located as nearly as practicable to the leases; the cost of transportation to market was not decreased a penny by their location; the parties have stipulated that the "function of the facilities" was to enable the oil to be stored in the vicinity of the leases; the trial court has held that the movement into storage was a part of the business of production, and not a part of its transportation to market. There is nothing in the record that enables us to hold that such a finding is without substantial support in the evidence.

The same conclusion may be reached by another route. Recognizing the obvious fact that Congress did not intend to tax all movements of oil through pipes, the Secretary of the Treasury, on July 18, 1921, issued its Tr. Dec. No. 3197, which reads: "Where the person so transporting is not a carrier, there is a taxable transportation of oil by pipe line within the meaning of Section 501 (d) whenever the movement of said oil, effected by the owner thereof, is substantially similar to those movements which pipe line carriers usually undertake and perform; or, in other words, where the movement is not merely local and incidental to another business engaged in by the person so transporting, such as the producing or refining of oil. Thus where a refiner maintains a main, trunk, or stem line from his refinery to an oil field or pool, the services he performs for himself are similar to those which pipe line carriers would otherwise render him. He should, therefore, pay the tax as though he had in fact employed the services of a carrier. If, on the other hand, the movement is from storage tanks to stills, which are a part of the same manufacturing unit, or from wells to flow tanks or storage tanks situate in the immediate vicinity, the movement is not such as a pipe line carrier of oil would normally render, and consequently should not be taxed."

■ This decision has stood through many sessions of Congress. That departmental construction of an ambiguous statute, if not clearly unreasonable, is of great aid in interpretation has long since been settled. Bissell v. Penrose, 8 How. 317, 12 L. Ed. 1095; United States v. Burlington & M. R. R. Co., 98 U. S. 334, 25 L. Ed. 198; Robertson v. Downing, 127 U. S. 607, 8 S. Ct. 1328, 32 L. Ed. 269; New York, N. H. & H. R. Co. v. Interstate Commerce Commission, 200 U. S.

361, 26 S. Ct. 272, 50 L. Ed. 515; Grand Trunk Western R. Co. v. United States, 252 U. S. 112, 40 S. Ct. 309, 64 L. Ed. 484; Brewster v. Gage, 280 U. S. 327, 336, 50 S. Ct. 115, 74 L. Ed. 457; United States v. Kirby Lumber Co., 284 U. S. 1, 52 S. Ct. 4, 76 L. Ed. ——. The facts in this case bring it squarely under this Treasury Decision. The movement is "local and incidental to another business engaged in by the person so transporting, such as producing or refining of oil." The movement is from "wells to flow tanks or storage tanks situate in the immediate vicinity"; it is not such a movement "as a pipe line carrier of oil would normally render," for the trial court has specifically found that "such movement was distinctly different from any service rendered by pipe line carriers in such vicinity." The judgment of the trial court is in accord with this Treasury Decision.

It is argued that this line of pipe from the wells to the storage tanks is not a "pipe line" in the true sense of the word, and in support thereof we are cited to the fact that the lexicographers agree that a "pipe line" is a conduit of pipe through which oil is conveyed from an oil region to market. Century Dictionary; Funk & Wagnalls (1927); Pogue's Economics of Petroleum (1921) p. 65. The argument is a plausible one, but we prefer to rest our decision on the broader grounds, and therefore do not pass upon the point.

The appellant relies on two cases which apply the rules herein set down to different facts. In Motter v. Derby Oil Co. (C. C. A. 8) 16 F.(2d) 717, it appeared that the tax-payer transported oil from its leases in Butler county, and other oil which it purchased, to its refinery at Wichita, a distance of some thirty miles, through a trunk pipe line. There was no question of storage as an incident of production involved; when the crude oil left the leases, it was destined to the end of its journey—the refinery. In Dixie Oil Co. v. United States (C. C. A. 5) 24 F. (2d) 804, 805, oil from the taxpayer's wells was pumped to settling tanks; from there it was pumped to the railroad loading rack a mile and a half from the lease, or to storage tanks from which it later was pumped to the railroad. The movement from the settling tanks or the storage tanks to the railroad was held to be "transportation," as undoubtedly it was, since the court found that: "The oil's journey to its destination had begun when it left plaintiff's premises, though that journey was interrupted by putting the oil in the loading rack." But note: The movement through a pipe line from the settling tanks to the storage tanks located across a 700-acre lease was not taxed. That court, in distinguishing production from transportation, held that: "The production of the oil, the extraction of it from beneath the earth's surface, and the preparation of it for transportation, by depositing it in settling or storage tanks, were completed before the movement of it from plaintiff's lease began."

Except that the distance is somewhat greater, the movement in this case is exactly comparable to the movement from the settling tanks to the storage tanks in the Dixie Case, a movement not taxed there, and one held by that court to be an incident to production.

The trial court has specially found as a fact that the movement here involved was an incident of production and not transportation; that the tanks were located in the producing field, but were not located on the producing leases for reasons given. Such findings support the judgment, which is therefore affirmed.